## FREEMAN PRICE

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa January 23, 1884.*

1. CRIMINAL LAW—*a detective participating in a criminal act—want of felonious intent.* On an indictment for burglary, for breaking and entering a dwelling house with intent to rob or steal, the intent with which the defendant enters the house is the *gist* of the charge, and if the proof does not show the felonious intent charged, no conviction can rightfully be had.

2. On the trial of several persons for burglary, where one claims that although he accompanied the others, and with them entered the house, he was acting merely as a detective, to fasten guilt on his associates, if the evidence tending to prove this fact is sufficiently strong to raise a clearly well founded doubt of his guilt, he ought to be acquitted.

3. SAME—*evidence admissible to show the intent.* One of several persons being tried on a charge of burglary, claiming that he was acting as a detective as to the others, testified to being approached by one of his co-defendants and requested to take a part in the proposed burglary and robbery. He was then asked whether or not he advised with one B., a justice of the peace, in reference to going with the parties intending to rob, which question the court refused to allow to be answered: *Held,* that the exclusion of the proposed evidence asked for was clearly erroneous. The giving of notice to a peace officer of an intended burglary or robbery, by one seemingly acting with others, tends strongly to negative any criminal intent on his part in afterward accompanying the real burglars.

4. SAME—*sufficiency of evidence as to the absence of a felonious intent.* Three persons were indicted for burglary, and convicted. It appeared in evidence that one of them, before the burglarious act was committed, gave information of the intended crime to a justice of the peace, and on the day the crime was in fact committed, informed a constable and others of the same, giving the names of all the persons concerned, and of the time and place of the proposed crime, and requested the constable to take steps to have the other defendants arrested, and that he accompanied his co-defendants to the place assigned and seemingly participated with them in their acts, and that on the following morning he gave such full information of the affair as led to the arrest of the parties. The jury found all the defendants guilty: *Held,* that under the facts of the case the conviction of the party giving such information, and who claimed to have acted as a detective, could not be sustained.

Writ of Error to the Circuit Court of Henry county; the Hon. John J. Glenn, Judge, presiding.

Mr. C. C. Wilson, for the plaintiff in error:

An officer indicted as an accessory to a burglary may, for the purpose of explaining his frequent intercourse with those indicted as principals, give in evidence the conversation between himself and another officer in relation to the best means of bringing them to justice. 1 Wharton on Crim. Law, (5th ed.) sec. 700; *Commonwealth* v. *Robinson et al.* 1 Gray, 555.

The whole evidence considered, it is evident that Price acted with the other parties as a detective, for the purpose of bringing them to justice, and a new trial should have been granted to him.

Mr. James McCartney, Attorney General, for the People:

There was no error in refusing to allow the plaintiff in error to testify as to his conversations with others. The court allowed those other persons to testify as to the conversations.

The jury were the exclusive judges of the credibility of the witnesses, and the weight to be attached to the testimony of each. *Valandschoot* v. *Adams*, 61 Ill. 368; *Peeples* v. *McKee*, 92 id. 397; *Rogers* v. *People*, 98 id. 581.

Mr. T. E. Milchrist, State's Attorney, also for the People:

The verdict of the jury will not be disturbed because of the insufficiency of the evidence, unless there is a clear and well founded doubt of the guilt of the accused. *Gainey et al.* v. *People*, 97 Ill. 270; *Needham* v. *People*, 98 id. 275.

Mr. Justice Mulkey delivered the opinion of the Court:

On the 28th of June, 1883, Freeman Price, impleaded with James Moran and Abel Lindohl, was tried and convicted in the Henry county circuit court for the crime of burglary, the

jury fixing the term of his confinement in the penitentiary at three years. A motion for a new trial having been made and overruled, the defendant was sentenced by the court to the penitentiary for the period fixed by the verdict. The accused having brought the case here for review, asks a reversal of the conviction, mainly on the ground it is not supported by the evidence.

The transaction upon which the indictment is based occurred about half-past six o'clock in the evening of the 9th of March, 1883, at the dwelling house of John Milroy, on his farm near the county line between Knox and Henry counties. Milroy testifies that at about the time indicated some one rapped at his door and inquired the road to Woodhull, a village some two or three miles distant; that about half an hour afterwards there was another rap at the door, and his wife, Mrs. Milroy, asked who was there, to which the party rapping replied, "It is me;" that she then inquired if it was Pete, meaning one of the neighbors, and receiving an affirmative answer, she thereupon opened the door, when three men, with cloths tied over the lower part of their faces, walked in, and one or all of them presented pistols, and said, "Your money or your life;" that witness stepped into the kitchen to get a spade to defend himself with, where he was followed by the largest one, who subsequently proved to be Moran; that upon witness drawing a spade on Moran, the latter presented a pistol, but did not shoot, nor did witness strike with the spade; that Mrs. Milroy remained in the first room with the other two; that upon their ordering her to get a light she did so, and handed it to one of them, and then passed through the pantry down into the cellar, and from thence out of doors, when she screamed for help; that the parties thereupon left, without having got any money or other valuables. The three persons who thus entered the house were the accused and his co-defendants, and it is conceded that the latter entered the house of Milroy, as stated, for the pur-

pose of robbing him; but the plaintiff in error insists, and we think the evidence tends strongly to show the fact, that his object in accompanying them was to expose the contemplated crime, and bring the real perpetrators of it to justice, and whether this is so or not is really the only question in the case.

The *gist* of the offence charged is the intent with which the plaintiff in error entered Milroy's house. The indictment charges it was with the intent to steal, and it is conceded the facts, as testified to by Milroy and his wife, are amply sufficient to make out a case against the accused, if there was no evidence explanatory of the criminating facts occurring at the house, and testified to by them, and it is therefore unnecessary to detail more particularly what transpired there. Judging the case by what occurred at Milroy's house alone, the plaintiff in error does not stand in any better position than his co-defendants, who are confessedly guilty, and have not therefore joined in the writ of error. The defence set up by the former is in the nature of a plea of confession and avoidance. If he was really, as he claims, acting the part of a mere detective in accompanying the other two on their criminal mission, it is a matter of no significance that no difference could be seen in his conduct and the other two at Milroy's house, for to have acted his part well that would reasonably be expected. To have merely stood by as though he were a silent spectator, would doubtless have excited the suspicions of his comrades, imperiled his own safety, and possibly have defeated the very object he claims to have had in becoming one of the party. The turning point in the case then is, is the evidence tending to show plaintiff in error was acting in the affair merely as a detective, sufficiently strong to raise a clearly well founded doubt of his guilt? If so, he ought not to be convicted.

The accused testifies the first intimation he had of an intention to rob Milroy he obtained from Moran, who came

to him and asked him to help rob an old man near Woodhull; that witness said to him first, "that is not my business," but afterwards said, "I will see about it;" that Moran came to him again, about four months ago, and asked him to go, when he said, as before, "I will see about it." The witness was then asked whether or not he advised with Mr. Byers in reference to going with Moran. This and other questions of similar import were propounded to the witness, all of which, on objection by the People, were held improper, and the witness was not permitted to answer them. The evidence shows that Byers, the individual referred to, was an attorney, and also a justice of the peace, and it was clearly erroneous to not permit the witness to answer the questions. It is clear enough the object of the inquiry was to show that he gave notice to an officer of the law of the intended breach of the Criminal Code, which would have strongly negatived any criminal intent on his part in going. It is also well settled one may prove his own declarations, when made just before or at the time of starting to a particular place, for the purpose of showing his motives or object in going.

But the error in excluding this evidence was, perhaps, cured by the subsequent testimony of the witness. Further on in his testimony, in answer to the question, "Did you take any steps, after you were informed of the intended robbery, to prevent it?" the witness states that he did, by informing Van-Riper, the constable, and Mr. Byers; that on the day of the robbery he called Van Riper out of Frederick's store, into the back room, and told him two young men were going to rob an old man, and also told him what Byers had said. The witness then proceeds in these words: "I said, you (meaning Van Riper) had better telegraph to Woodhull and have the officers ready for them. He said, 'It won't do. Let them go on, and if they steal anything they will be caught. If they see the officers, they'll skip.' I told him these two, and another from Oneida, were going to rob Milroy; that they

were going at 1:40 on that day. I told him to have officers at Milroy's house. This was in Frederick's store, in Altona. Milroy's house was eight or twelve miles from Altona." In answer to the further question, "Did you call on any one else that day, and inform them of the intended robbery?" the witness replied, "Yes; I saw Martin, the jeweler, of Altona, and I was at Byers' house for that purpose. I told Van Riper in the forenoon, and told him what Byers had told me about it. I told him I had spoken to Byers, and that Byers had · said, 'Let me know when these men are to do this,' and I said I would. I said to him, 'Shall I work with them?' and he said yes. The conversation with Byers was at six or seven o'clock the night before the talk with Van Riper, and the talk with Van Riper was in the forenoon of the day we went to Milroy's. Byers is the man that told me to help them, and encouraged me."

While Byers denies that Price told him of the intended robbery before it occurred, yet he admits he called at his office next morning and told him all about what had happened, and through the information thus given the parties were arrested that day. Moreover, Col. Buswell, ex-sheriff of the county, testifies to a conversation with Byers, the next morning after the attempted robbery, in which the latter told him all about the affair, and witness states as his best recollection that Byers said Price had told him of the intended robbery before the attempt was made. Mrs. Adams, the mother of Price, also testifies that in a conversation she had with Byers, after the attempted robbery occurred, the latter said, referring to her son, "He did not do as he (Byers) told him; that he went into the house, when he told him to stay out." She further states that her son told her all about the affair next morning, after it occurred. The details of this witness' conversation with Byers, as given by her, notwithstanding she is the mother of the accused, are so natural and free from anything indicating they might have been manu-

factured for the occasion, as to irresistibly carry with them the conviction that her statement is true. Moreover, certain concessions are made by Byers, on cross-examination, which we think strengthen her testimony. He fully corroborates her as to the time, place and occasion of her conversation with him, and while he denies that Price told him beforehand of the intended robbery, yet in testifying to his interview with Col. Buswell, he used this language: "I did not tell him (Buswell) that Price came to me and told me of the intended robbery. *I think I told him that Bob did not act as I had told him to.*" That Price told the constable, Van Riper, of the intended robbery before and on the day it was attempted, and that Price visited Byers on the same day, as he claims, for the purpose of communicating the same fact to him, is not at all disputed. The constable fully corroborates Price's statements as to the conversation with him in the back room of Frederick's store, on the day of the attempted robbery. Van Riper, referring to Price, says: "He called me in the back room of Frederick's store, and said he had something to tell me; that there was to be a racket at Milroy's, and wanted me to get a squad of men and arrest them," etc.

Waiving all controverted questions, the undisputed facts, as appears from the foregoing, are, that the accused, on the day of the attempted robbery, went deliberately to a constable of the town in which he lived and told him all about the contemplated crime, giving the true names of the parties, and telling him when and where it was to take place, and the name of the intended victim; that the attempt was made at the very time and place, and by the parties, stated by him, and that on the following morning he, in like manner, went to a justice of the peace and told him all about what had been done, and furnished him with the true names of the parties implicated, by means of which, on the same day, they were brought to trial, and were subsequently convicted of the crime. That a sane person, really guilty of committing so

grave a crime as the one imputed to the accused, would thus act, is so inconsistent with all human experience as not to warrant the conviction of any one under the circumstances shown. The accused is a mere youth, only some nineteen years of age at the time of this transaction, and the fact that some of his conduct subsequent to the occurrence tends rather to strengthen the view taken by the jury, as is conceded, yet that may well have resulted from his youth and inexperience. But as to the exculpating facts above stated, we see no rational solution of them, and none that is satisfactory has been suggested by counsel for the People which would seem to warrant the conviction.

The judgment of the circuit court is therefore reversed, and the cause remanded for further proceedings not inconsistent with what is here said.

*Judgment reversed.*

Mr. JUSTICE SCOTT, dissenting:

Dissenting, as I do, from the conclusion reached by the majority of the court, I deem the questions involved of sufficient importance to justify the expression of my views at length, of the whole case.

At the June term, A. D. 1883, of the circuit court of Henry county, Freeman Price, James Moran and Abel Lindohl were jointly indicted for the crime of burglary. On being arraigned defendants pleaded not guilty. At the trial they were all found guilty in manner and form as charged in the indictment, and the jury, by their verdict, fixed the term each should serve in the penitentiary. Price entered his motion for a new trial. It was overruled, and sentence pronounced on the verdict. To reverse that judgment Price brings the case to this court on a writ of error.

It is not denied that Moran and Lindohl entered the house of John Milroy with the burglarious intent to rob him of his money, which they supposed he had in his house at the time,

nor that Price was with them in the house, and did, to some extent, at least, assist them in the attempt they made to compel Milroy to deliver up his money. The defence insisted upon by Price is, that what he did was done without any felonious intent, but with a desire and purpose to detect and bring to punishment the guilty parties.

There is some evidence tending to establish the defence insisted upon, but of course the weight to be given to it was within the province of the jury to determine. It was for them to determine, from all the evidence before them, with what intent he acted. Under the statute of this State, as is well known, the jury in criminal cases are the judges of the law and the fact, and unless some error in the rulings of the court occurs on questions of law, calculated to mislead the jury as to questions of fact involved, or as to the admission or rejection of evidence, their verdict is seldom disturbed.

On considering the instructions given for the prosecution in this case, no serious objection is perceived to any of them. The law applicable to the facts is stated with sufficient accuracy. The fifth instruction of the series given for defendant certainly states the law as favorably for the defence he was making as he could expect to have it given. There is no just ground for complaint in the action of the court in giving and refusing instructions at the trial.

The defence is placed mainly on the broad ground defendant is guilty of no crime. At the trial he offered to prove, by his own testimony, that before going to the house where the burglary was to be committed, he told a justice of the peace, and perhaps a constable, what the parties contemplated doing, and asked the advice of the justice as to the propriety of his going with them, and that he was advised to do so that he might detect the parties in the commission of crime. To the giving of the proposed testimony an objection was interposed by the State's attorney, which was sustained by the court. If it shall be conceded the testimony tendered was

competent, the accused was not prejudiced by the ruling of the court, for at a subsequent period of the trial the testimony was in fact all admitted, and he had the benefit of it. The jury were distinctly instructed by the court to consider such testimony in passing upon the guilt or innocence of defendant. That, no doubt, was done, and that was the utmost the accused could have asked to have done in his favor.

Passing, then, to the consideration of the merits of the defence, there remains only to be considered the question of fact raised on the evidence, and that has relation to the guilt or innocence of the accused. As we have seen, that is ordinarily a question of fact for the jury, but still it is the duty of the court to see that no injustice is done, either from the passion or prejudice of the jury, or from any other cause. On looking into the testimony contained in the record, it can not be said the verdict is so much against the weight of the evidence as to warrant a reversal of the judgment. It may be, and is, doubtless, true, the accused had some talk with the constable or the justice of the peace, or with both of them, as to his purpose in going to the house of the prosecuting witness, prior to his going there, and it is certain that after he returned he communicated what had been done, to the officers of the law and others. These facts the jury were told they must consider in making up their verdict. Giving to these and all other extenuating facts all the force they are justly entitled to, it may be the jury rightly judged the accused did more than it would be lawful for a detective to do. It is admitted the accused went to the house of the prosecuting witness with others whose avowed purpose was to rob him of his money. That he might have done with no criminal intent. But he went much farther. It is proven he entered the house where the burglary was to be committed with one who carried a drawn pistol, that he knew was loaded with a deadly charge, that he presented in the face of the prosecuting witness, and "demanded his life or his money,"

and that accused aided him in his wicked purpose by his presence, and by exhibiting an unloaded pistol, and by the use of threatening language calculated to intimidate the witness and his wife, both of whom were old persons, and alone in their house in the night time. But for the unusual bravery exhibited by the prosecuting witness and his wife, the attempt to rob them might have been, and no doubt would have been, successful, and that result would have been accomplished, in part, at least, by the acts of the accused. It might be admitted the accused went to the house with no original felonious intent, yet, as has just been seen, he stood by and aided another while he was attempting to commit a felony. That made him a principal in the wrongful act. It was unlawful for him to aid in the perpetration of a crime under the pretense he was acting as a detective. His presence in the house with pistol in hand, whether loaded or unloaded, was a cause of terror to the parties assailed, and as effectually aided the man who was attempting to rob them as though the intention of the accused had from the beginning been felonious. It is no answer to this view of the case to say that he notified the officers to be present and make arrests. When he ascertained there were no officers or others present to make arrests, he ought to have stopped before entering the house, and given the alarm elsewhere. This he did not do, nor is it shown he was prevented from doing it by intimidation or otherwise, but on the contrary, he actually participated in the attempted crime. The effect of his presence upon the witness and his wife was the same as if he was in very fact one of the "James boys," as he declared he was. The law will tolerate no such conduct. It would be to establish a most pernicious doctrine to hold that a person might participate in the commission of a felony, and obtain immunity from punishment on the ground he was a mere detective or spy upon the conduct of others.

It may be said the accused was a young man, and may have acted unwisely, and did a wrongful act with no criminal intent. The intent of the participator in any act must be gathered from what is done. There is no other mode of arriving at motive. Should it be conceded there are facts and circumstances proven that tend to excuse the guilty conduct of defendant, that is a consideration to be addressed to the executive department of the State, rather than to the courts. It is plainly proven defendant was present, and aided in the attempt to commit a most outrageous crime, and it is no justification to say he was doing it as a detective, to bring others to punishment. One who attempts to detect the commission of crime in others must himself stop short of overt criminal acts. Any other rule would permit great outrages under the specious pretense of detecting crime.

The judgment of the circuit court, in my opinion, ought to be affirmed.

Mr. Justice Craig, also dissenting.

Mr. Justice Walker: I do not concur in this decision.